546 F.2d 1336
 L. R. BRETZ, Petitioner-Appellant,
v.
Roger CRIST, etc., et al., Respondents-Appellees.
Merrel CLINE, Petitioner-Appellant,
v.
The STATE OF MONTANA, etc., et al., Respondents-Appellees.
 Nos. 76-1572 and 76-1169.
 United States Court of Appeals,
Ninth Circuit.
 Nov. 18, 1976.
 
 W. William Leaphart (argued), Helena, Mont., for petitioners-appellants.
 Albert W. Meloling, Sp. Asst. Atty. Gen. (argued), Helena, Mont., for respondents-appellees.
 Before CHAMBERS, Chief Judge, and TUTTLE* and KILKENNY, Circuit Judges.
 TUTTLE, Circuit Judge:
 
 
 1
 The tension between federalism and the doctrine of selective incorporation of Bill of Rights guarantees via the Fourteenth Amendment inevitably generates appeals such as this. Appellants contend that a second prosecution brought against them by the State of Montana violated the double jeopardy clause of the Fifth Amendment as applied to the states through the due process clause of the Fourteenth Amendment. In denying their petition for habeas corpus, following conviction at the second trial, the United States District Court for the District of Montana agreed with the state that state, not federal, law determines when jeopardy attaches and therefore under the controlling Montana statute appellants had not been put in jeopardy by the first prosecution; and, in the alternative, that federal standards for reprosecution following a declaration of mistrial had been met. Cunningham v. District Court, 406 F.Supp. 430, 432-434 (D.Mont.1975) (consolidated case).I. A TALE OF TWO TRIALS
 
 
 2
 The evidence at the trial would justify finding that appellants Bretz and Cline concocted a scheme to fraudulently obtain workmen's compensation payments as beneficiaries of one Wampole, deceased. The plan's particulars were not illuminated on appeal, but it appears that appellants filed a claim with the Montana Workmen's Compensation Division, alleging that Wampole was an employee of Courtesy Mobile Home Transporting, Inc.; that he suffered a fatal injury in the course of his employment; and that they were entitled to benefits on his behalf. Appellants prepared and submitted three different documents to the Workmen's Compensation Division: a "Claim for Compensation;" an "Employer's First Report of Occupational Injury or Disease;" and a "Petition for Compromise Settlement." Based on these documents, the Division paid a settlement of $5400 to the appellants.
 
 A. The Charges
 
 3
 Claiming that Wampole had never been employed by Courtesy, and had not been fatally injured in the course of his alleged employment, the state filed a nine-count information on October 3, 1974. The state leveled the following charges against the appellants:
 
 
 4
 (1) Count I contended that the entire scheme constituted grand larceny in violation of REV. CODE OF MONTANA § 94-2701(1)(1948), and specified that the offending conduct occurred between January 13, 1973 and February 19, 1974.
 
 
 5
 (2) Count II also applied to the entire scheme, and maintained that appellants committed the crime of obtaining money and property by false pretenses in violation of REV. CODE OF MONTANA § 94-1805 (1947). Due to a typographical error, however, the information specified that the offending conduct occurred between January 13, 1974 and February 19, 1974.
 
 
 6
 (3) Counts III through VIII fragmented[1] appellants' conduct into three instances of preparing false evidence in violation of REV. CODE OF MONTANA § 94-1703 (1947) and three instances of offering false evidence in violation of REV. CODE OF MONTANA § 94-1701 (1947). Each of the three documents submitted by appellants to the Division anchored a pair of offenses. Thus, the "Claim for Compensation" was the basis for charges of preparing false evidence and offering false evidence between the dates of February 5, 1973 and February 13, 1973 (Counts III and IV); the "Employer's First Report" was the basis for similar charges of criminal conduct during the period March 19, 1973 to March 22, 1973 (Counts V and VI); and the "Petition for Compromise Settlement" was the basis for similar charges of criminal conduct during the period January 30, 1974 to February 1, 1974 (Counts VII and VIII);
 
 
 7
 (4) Count IX returned to the entire scheme and alleged that the appellants' conduct amounted to presenting false proofs upon a policy of insurance in violation of REV. CODE OF MONTANA § 94-2202 (1947), the offending activity supposedly having occurred between January 13, 1973 and February 19, 1974.
 
 B. The First Prosecution
 
 8
 The following facts are conclusively established by the record. On March 10, 1975, counsel for the state and for appellants answered ready in the state trial court. On March 12, 1975, before voir dire had been completed, the trial court granted the state's motion to dismiss Count IX of the information (presenting false proofs upon a policy of insurance). On March 13, 1975, a jury was impaneled and sworn. Before opening statements and before any evidence had been offered, the jury was excused as defense counsel presented several motions to the court. The most important of these motions sought to restrict the state's evidence to the allegations of the information. This tactical stroke was aimed at Count II (obtaining money and property by false pretenses): the information mistakenly charged that the conduct constituting this offense had occurred between January 13, 1974 and February 19, 1974, but the relevant statutory provision, Rev. Code of Montana § 94-1805 (1947), had been repealed effective January 1, 1974.
 
 
 9
 The state resisted this attempt to excise Count II from its case, and on March 21, 1975, moved to amend Count II to correct the typographical error. On March 24, 1974, the trial court denied this motion and sua sponte dismissed Count II for failing to state an offense.[2] After the Montana Supreme Court declined to grant the state's petition for a writ of supervisory control, the state returned to the trial court and moved to dismiss the remaining counts in order to "file a new and different information." The trial court granted the motion for this "limited purpose" and discharged the jury on April 4, 1975.
 
 C. The Second Prosecution
 
 10
 On the same day that the trial court dismissed the first information, the state filed a second, two-count information. Count I accused the appellants of grand larceny, and tracked the language of Count I of the original information. Count II charged them with obtaining money and property by false pretenses, and corrected the typographical error that had flawed the original information. A new jury was impaneled, appellants' motion to dismiss on grounds that the prosecution placed them twice in jeopardy was denied, and appellants were found guilty of obtaining money and property by false pretenses. After exhausting available state postconviction remedies, appellants sought and were denied habeas corpus relief by the district court.
 
 II. ATTACHMENT OF JEOPARDY
 
 11
 Before 1969, the Supreme Court employed different criteria to test the constitutional permissibility of reprosecutions by state and federal authorities. Even though double state trials might run afoul of Fifth Amendment barriers to federal reprosecutions, the Fourteenth Amendment was thought to pose no constitutional obstacle to state retrials unless the proceedings exposed the accused to "that kind of double jeopardy (which creates) a hardship so acute and shocking that our polity will not endure it." Palko v. Connecticut, 302 U.S. 319, 328, 58 S.Ct. 149, 153, 82 L.Ed. 288 (1937).[3] In Benton v. Maryland, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969), however, the Supreme Court eschewed Palko's "approach to basic constitutional rights," and found "that the double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage, and that it should apply to the States through the Fourteenth Amendment." The question in Benton was whether an accused who successfully appeals a conviction may be reprosecuted not only for the offense of which he was convicted, e. g., North Carolina v. Pearce, 395 U.S. 711, 719-20, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (no Fifth Amendment bar to state retrial on same charge when defendant appeals and wins reversal), but also for an offense of which he was acquitted at the first trial. Relying on federal precedents, the Benton court held that the acquittal could not be reopened, and based its derivative holding on the proposition that "(o)nce it is decided that a particular Bill of Rights guarantee is 'fundamental to the American scheme of justice,' . . . the same constitutional standards apply against both the State and Federal Governments." 395 U.S. at 795, 89 S.Ct. at 2063.
 
 A. A Question of Lawmaking Competence
 
 12
 An arithmetical as well as constitutional precondition to being " subject for the same offense to be twice put in jeopardy of life or limb," U.S.Const. Amend. V, is to be once put in jeopardy. Hence the theory of attachment of jeopardy, admittedly an attempt at ratification, but nevertheless serving to signify that point in the state's efforts to secure a conviction when the interests protected by the double jeopardy clause are sufficiently implicated to warrant barring a second prosecution absent special countervailing considerations. If the state rule that jeopardy does not attach until "after the first witness is sworn," Rev. Code of Montana, § 95-1711(3)(d) (1947) is controlling, then petitioners were never put in jeopardy by the first prosecution and their second trial a fortiori could not have contravened the constitutional command. See Alexander v. Fogliani, 375 F.2d 733, 734 (9th Cir. 1967) (no double jeopardy violation where, because jury had not been impaneled, jeopardy could not have attached). But if the federal rule that jeopardy attaches when a jury is impaneled and sworn, e. g., Downum v. United States, 372 U.S. 734, 735-36, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) is of constitutional dimension, then jeopardy attached at the first trial and unless the mistrial declaration was consonant with the "manifest necessity" doctrine, see Part III infra, the second trial was constitutionally impermissible. The threshold question is thus whether the federal attachment of jeopardy rule is a product of constitutional exegesis or simply a nonconstitutional consequence of the Supreme Court's supervisory power over federal courts and federal officials.
 
 
 13
 We reject at the outset the notion that while the double jeopardy clause constrains reprosecutions by the states, it countenances different constitutional applications in state and federal courts. To be sure, this double-barreled incorporation doctrine can claim its supporters,[4] but it has never commanded a majority of the Supreme Court. Each time the due process clause of the Fourteenth Amendment has been interpreted to encompass a particular guarantee of the Bill of Rights, the Court has explicitly reaffirmed the proposition that the same constitutional norms are to be employed in assessing the conduct of state and federal authorities. E.g., Ker v. California, 374 U.S. 23, 33, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963) ("the standard of reasonableness is the same under the Fourth and Fourteenth Amendments"); Malloy v. Hogan, 378 U.S. 1, 11, 84 S.Ct. 1489, 1495, 12 L.Ed.2d 653 (1964) ("the same standards must determine whether an accused's silence in either a federal or state proceeding is justified"); Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965) (Sixth Amendment confrontation clause "is 'to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment' ") (citation omitted). Read in the context of these and other landmark incorporation decisions, Benton's declaration that "the same constitutional (double jeopardy) standards apply against both the State and Federal Governments", Benton v. Maryland, 395 U.S. 784, 795, 89 S.Ct. 2056, 2063, 23 L.Ed.2d 707 (1969), and its determination that "the validity of (state) larceny conviction(s) must be judged . . . under this Court's interpretations of the Fifth Amendment double jeopardy provision." 395 U.S. at 796, 89 S.Ct. at 2063, compel the conclusion that if the federal attachment of jeopardy rule is constitutionally mandated in federal courts, no different rule may be followed by state courts.
 
 
 14
 Neither the Court's application of the exclusionary rule nor the jury trial cases embarrass the Supreme Court's position that the coverage of selectively incorporated provisions of the Bill of Rights must be coextensive in state and federal tribunals. It is true that although the Fourth Amendment's prohibition of unreasonable searches and seizures was made applicable to the states in Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), the Supreme Court delayed full enforcement of the federal exclusionary rule, see Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), against the states for another twelve years. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); cf. Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (evidence illegally obtained by state officials may not be used in federal prosecutions). Recent Supreme Court decisions, however, demonstrate that the exclusionary rule is a "judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved," United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974); accord, United States v. Peltier, 422 U.S. 531, 538-39, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). The Court's holding in Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), that a state prisoner afforded an adequate opportunity to contest the admission of illegally seized evidence at his state trial is not entitled to federal habeas corpus consideration of such a claim, confirms that the exclusionary rule, while constitutionally inspired, is not constitutionally required. Thus the hiatus between Wolf and Mapp gives us no pause: because the exclusionary rule is not constitutionally required that is, it forms part of "a substructure of substantive, procedural and remedial rules . . . a constitutional common law subject to amendment, modification, or even reversal by Congress"[5] its belated application to the states exposes no flaw in the Court's selective incorporation doctrine.
 
 
 15
 The state misreads Williams v. Florida, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), as encouraging respect for state "procedural" rules that leave the "substance" of federal constitutional rights intact. Williams held that a state need not provide a 12-person jury in order to comply with the jury trial requirements of the Sixth Amendment. In Apodaca, a plurality of four Justices maintained that when a state dispenses with the unanimity requirement, it does not scuttle the Duncan -incorporated jury trial guarantee. The crucial point, however, is that the Williams majority and the Apodaca plurality treated the 12-person and unanimity requirements, respectively, as non-constitutional rules in federal as well as state courts.[6] That is, neither requirement was termed a sine qua non of the jury trial right protected by the Sixth Amendment in federal courts, and thus neither under established incorporation doctrine was found to be indispensable in state proceedings.
 
 
 16
 B. Constitutional Status of the Attachment of Jeopardy Rule
 
 
 17
 The attachment of jeopardy rule performs a crucial service in double jeopardy jurisprudence, but its office is confined to the mistrial context. When the question is whether an accused is threatened with double punishment,[7] whether two trials focus on the "same offense,"[8] whether governmental appeal amounts to second jeopardy,[9] or whether reprosecution after dismissal[10] or defendant's successful appeal[11] constitutes double jeopardy, attachment of jeopardy at some time during a former prosecution is not controverted. The issue in these types of cases is whether the particular additional punishment or procedure is a constitutionally prohibited second run through the gantlet. Many mistrial cases require a similar analysis, see Part III infra. On this appeal, however, we confront the question whether the first proceeding put appellants in jeopardy, for the state neither maintains that the second prosecution failed to put appellants in jeopardy nor suggests that the tantalizing but firmly rejected theory of "continuing jeopardy"[12] now be embraced to unite both proceedings as only one jeopardy.
 
 
 18
 Before Downum v. United States, 372 U.S. 735, 83 S.Ct. 1033 (1963), the Supreme Court had no occasion to announce a rule governing the attachment of jeopardy: all previous mistrial cases had held that the declaration of mistrial was proper and that therefore retrial did not give rise to a cognizable double jeopardy claim, see, e. g., note 24, infra. Leading Courts of Appeals cases did not observe an analytical distinction between situations when jeopardy attaches during the first proceeding and those in which a subsequent proceeding subjects the accused to a second jeopardy,[13] but the Supreme Court in Downum clearly perceived the issue as whether the facts justified retrial after a mistrial "although the jury impaneled for the first trial was discharged without reaching a verdict and without the defendant's consent." 372 U.S. at 736, 83 S.Ct. at 1034. Since the mistrial in Downum had been declared after the first jury was impaneled but before any evidence had been introduced, 372 U.S. at 741, 83 S.Ct. 1033 (Clark, J., dissenting); Downum v. United States, 300 F.2d 137, 139-40 (5th Cir. 1962), the case necessarily stands for the proposition that jeopardy attaches when a jury is impaneled. The Court explicitly adopted this reading of Downum in Illinois v. Somerville, 410 U.S. 458, 467-68, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), and Serfass v. United States, 420 U.S. 377, 388, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975). Cf. United States v. Sisson, 399 U.S. 267, 302-03, 90 S.Ct. 2117, 2137, 26 L.Ed.2d 608 (1970) (statutory construction: phrase "put in jeopardy" of Criminal Appeals Act "confine(s) the Government's right to appeal . . . to situations in which a jury has not been impaneled").[14]
 
 
 19
 We hold that the attachment of jeopardy rule applied in Downum, Somerville and Serfass is a constitutional requirement of the Fifth Amendment which is binding on the states as well as the federal government. The rule itself serves as the lynchpin for all double jeopardy jurisprudence. Serfass v. United States, 420 U.S. 377, 393, 95 S.Ct. 1055, 1065, 43 L.Ed.2d 265 (1975) ("fundamental principle that an accused must suffer jeopardy before he can suffer double jeopardy"); Illinois v. Somerville, 410 U.S. 458, 467-68, 93 S.Ct. 1066, 1072, 35 L.Ed.2d 425 (1973) ("the conclusion that jeopardy has attached begins . . . the inquiry . . . . Only if jeopardy has attached is a court called upon to determine whether the declaration of a mistrial" comports with the double jeopardy clause). Justice Harlan writing for the Court in United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971),[15] clearly indicated the constitutional stature of the rule: "the conclusion that 'jeopardy attaches' when the trial commences expresses a judgment that the constitutional policies underpinning the Fifth Amendment's guarantee are implicated at that point in the proceedings." 400 U.S. at 480, 91 S.Ct. at 555. The Chief Justice's opinion in Serfass v. United States,420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975), buttresses our conclusion: "the courts have found it useful to define a point in criminal proceedings at which the constitutional purposes and policies are implicated by resort to the concept of 'attachment of jeopardy,' " 420 U.S. at 388, 95 S.Ct. at 1062 (emphasis supplied).
 
 
 20
 The Supreme Court has consistently applied the federal attachment of jeopardy rule to state cases. In Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), the Court unhesitatingly turned to the federal rule as the first step in a two-step analysis to determine (1) when jeopardy attached and (2) whether subsequent proceedings amounted to a second jeopardy. See 410 U.S. at 467-68, 93 S.Ct. 1066. Montana points out that the federal and state attachment of jeopardy rules in Somerville were identical, see, e.g., People v. Somerville, 88 Ill.App.2d 212, 232 N.E.2d 115, 117 (1967), but this erroneously equates a circumstance with a dispositive factor in a Supreme Court opinion. The Somerville Court never mentions the state rule, and a thorough sifting of the opinion fails to discover even a shard of evidence suggesting that the Court did not consider federal standards controlling.
 
 
 21
 Breed v. Jones, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), resolves any doubt that federal standards determine when jeopardy attaches. In Breed, a unanimous Court ruled that a juvenile may not be tried as an adult for violation of a criminal statute when the alleged violation has previously been the basis for a juvenile court's adjudicatory determination of delinquency. The state contended that jeopardy had not attached during the juvenile court proceedings. 421 U.S. at 527, 95 S.Ct. 1779. Despite a statute authorizing transfer and trial in the adult division after an adjudication of delinquency a state rule that jeopardy did not attach in juvenile court the Supreme Court applied federal standards in deciding whether and when jeopardy attached, 421 U.S. at 528-31,[16] 95 S.Ct. 1779.
 
 
 22
 Montana correctly urges that Breed v. Jones did not "baldly assert that a state cannot determine at what point a trial commences," and argues that no constitutional violation occurred here because under the Montana statute appellants were "tried but one time." Brief for Appellees at 7. But the circularity of the argument is palpable, and the reliance on Breed transmutes literal facts into constitutional finding. Montana neglects to point out that Breed also rejected on federal constitutional grounds the state law doctrine that the adult division trial merely "continued" the juvenile jeopardy. 421 U.S. at 532-35, 95 S.Ct. 1779. If the constitutional protection against double trials as well as double punishment[17] is not to be circumvented, federal law must be authoritative in defining when the first trial begins as well as when it ends, i. e., when the accused is first put in jeopardy as well as when prior proceedings amount to former jeopardy. See Breed v. Jones, 421 U.S. 519, 534, 95 S.Ct. 1779, 1788, 44 L.Ed.2d 346 (1975) ("the fact that the proceedings against respondent had not 'run their full course,' . . . within the contemplation of the California Welfare and Institutions Code . . . does not satisfactorily explain why respondent should be deprived of the constitutional protection against a second trial"); Price v. Georgia, 398 U.S. 323, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1969) (state may not employ continuing jeopardy theory to abrogate constitutional rule that acquittal ends first jeopardy).
 
 
 23
 Illinois v. Somerville and Breed v. Jones leave little room for argument, although the cases do not contain unequivocal language specifying federal rules of decision in attachment of jeopardy cases. Montana thus claims that a distinguishable state decision,[18] as "the sole case on point," recognizes state responsibility for defining the attachment of jeopardy. To the contrary, our researches reveal that the three Courts of Appeals that have considered the question have held that the task of defining attachment of jeopardy is a federal constitutional task. In United States ex rel. Somerville v. Illinois, 447 F.2d 733, 735 (7th Cir. 1971), rev'd on other grounds, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), the Seventh Circuit was presented with an argument identical to that made here, and ruled that federal, not state, law "is controlling on the issue as to when jeopardy attaches." Similarly, the Court of Appeals for the Third Circuit applied the federal rule to a state law case in United States ex rel. Gibson v. Ziegele, 479 F.2d 773, 776 (3d Cir. 1973), cert. denied, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973). Finally, in Smith v. Mississippi, 478 F.2d 88, 93 (5th Cir.), cert. denied, 414 U.S. 1113, 94 S.Ct. 844, 38 L.Ed.2d 740 (1973), the Fifth Circuit analyzed the double jeopardy claim of a state prisoner as follows:
 
 
 24
 "the (state's) contention that petitioner was not 'put to trial' or was in no way prejudiced by the dismissal of the proceedings before testimony was presented has been decided adversely to it by the Supreme Court in Downum . . . and . . . Somerville. . . . In both cases the Supreme Court held that jeopardy attached when the first jury was selected and sworn. The mere introduction of evidence has no spontaneous effect on a defendant which can be said to automatically charge him with an appreciable degree of insecurity once he has made the preparations for trial and selected those of his peers who will determine his fate."
 
 
 25
 Montana debates the comparative efficacy of the federal rule versus its own rule, relying on the belief of the Montana Supreme Court that there is "no substantial difference between the two rules," State v. Cunningham, 535 P.2d 186, 189 (Mont.1975). One must, of course, concede that line drawing an unavoidable incident of judicial decision "cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little," Duncan v. Louisiana, 391 U.S. 145, 161, 88 S.Ct. 1444, 1453, 20 L.Ed.2d 491 (1968). But to make the very difficulty of constitutional decisionmaking a reason to disregard authoritative Supreme Court precedent is not a proposition to be considered. See, e. g., Baldwin v. New York, 399 U.S. 66, 73-74, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970) (state may not employ its own felony/misdemeanor classification, rather than federal potential sentence rule, to trigger jury trial guarantee despite similar results of the rules.)
 
 
 26
 Moreover, we question the accuracy of the Montana Supreme Court's view that there is "no inherent merit in the federal rule over Montana's state law," State v. Cunningham, 535 P.2d 186, 188 (Mont.1975). Cunningham incorrectly proceeds on the assumption that the attachment of jeopardy rule is designed to prevent prosecutorial manipulation. 535 P.2d at 188-89. But as the Montana Supreme Court recognized, the trial court's correct application of mistrial doctrine, see Part III infra, is the only effective safeguard against prosecutorial overreaching. 535 P.2d at 188-89. The attachment of jeopardy rule addresses different concerns: (1) protecting the accused from the financial, physical and psychological enervation worked by repetitive prosecutions;[19] and (2) preserving the accused's " 'valued right to have his trial completed by a particular tribunal,' . . . independent of the threat of bad-faith conduct by judge or prosecutor."[20] We decline to substitute a contradictory state rule for the Supreme Court's judgment that these concerns reach constitutional critical mass when the jury is impaneled and sworn.[21] And if preventing misconduct were the main purpose of the rule, a concern for prophylaxis would favor the federal formulation it cannot be denied that the federal rule, which provides for earlier attachment, lessens the potential for misfeasance.
 
 III. RETRIAL AFTER MISTRIAL
 
 27
 Preconstitutional courts in America and England offered protection against double jeopardy only to defendants who had been pursued to the point of a final judgment or verdict. Whether the framers envisioned the double jeopardy clause as affording a broader protection against reprosecution after prematurely terminated trials is not disclosed by available historical evidence.[22] Thus it is not surprising that in United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824), Mr. Justice Story treated the first mistrial case to reach the Supreme Court as presenting questions of the general law of the United States rather than constitutional issues. Perez held that retrial was not barred when a court discharges a jury unable to agree on a verdict. In terms that later became the touchstone for constitutional analysis, Justice Story declared that "the law has invested courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is manifest necessity for the act, or the ends of public justice would otherwise be defeated," and found "the security which the public have for the faithful, sound and conscientious exercise of this discretion," to rest "upon the responsibility of the judges, under their oaths of office." 22 U.S. (9 Wheat.) at 580.
 
 
 28
 A declaration of mistrial anticipates reprosecution, but as early as Simmons v. United States, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891), an erroneously declared mistrial was viewed as creating a potential double jeopardy problem. Simmons and Logan v. United States, 144 U.S. 263 (1892), attached constitutional significance to Perez ' delphic concepts of "manifest necessity" and "the ends of public justice," which are now firmly established as constitutional standards of review of mistrial cases, see e. g., United States v. Dinitz, 424 U.S. 600, 603-607, 96 S.Ct. 1075, 1078-1080, 47 L.Ed.2d 267 (1976); Illinois v. Somerville, 410 U.S. 458, 461, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). Since appellants were put in jeopardy at their first trial, see Part II supra, the remaining question on appeal is whether, under the Perez standards, the mistrial was declared in circumstances that permit reprosecution.
 
 A. The Legacy of Perez
 
 29
 The rationale behind allowing retrial following mistrial rulings that meet the Perez standards for any retrial exposes a defendant to double trials and also substitutes a new jury for that originally chosen was outlined in Wade v. Hunter, 336 U.S. 684, 688-89, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949):
 
 
 30
 "The double-jeopardy provision of the Fifth Amendment . . . does not mean that every time a defendant is put to trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment. Such a rule would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed."
 
 
 31
 In administering the Perez test, the Court has been reluctant to resort to mechanical rules to resolve the conflict between a defendant's Fifth Amendment rights and society's interest in full enforcement of the criminal law. Nevertheless, ever since Justice Story cautioned that the power to declare a mistrial should be employed only "under urgent circumstances, and for very plain and obvious causes," 22 U.S. (9 Wheat.) at 580, one uniform requirement has been imposed on all mistrial cases. That requirement and the reason for it were explained in United States v. Jorn, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971):
 
 
 32
 "If (the) right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial. . . . (T)he Perez doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings."
 
 
 33
 Accord, United States v. Dinitz, 424 U.S. 600, 603-611, 96 S.Ct. 1075, 1078-1082, 47 L.Ed.2d 267 (1976); Illinois v. Somerville, 410 U.S. 458, 462-63, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973).
 
 
 34
 Applying this principle to the instant case, we hold that retrial on Count I (grand larceny) of the original information was prohibited by the double jeopardy clause. Unlike Count II (obtaining money and property by false pretenses), Count I was sufficient to state an offense. Its dismissal necessarily denied appellants the chance to take the grand larceny charge "to the first jury and, perhaps, end the dispute then and there with an acquittal," United States v. Jorn, 400 U.S. 470, 484, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971). Yet no reason other than the state's convenience in litigating the case as a unit appears to have prompted the mistrial declaration. Certainly the "public's interest in fair trials designed to end in just judgments," Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), could have been adequately served by completing the trial on Count I. In these circumstances, the mistrial and retrial on Count I amounted to an archetypal double jeopardy violation.
 
 B. Mistrials and State Procedural Rules
 
 35
 Count II (obtaining money and property by false pretenses) of the original information presents a different issue. The trial court dismissed Count II sua sponte after denying the state's motion to amend the information in order to correct a typographical error. Unamended, Count II failed to state an offense, but unfortunately that circumstance is not dispositive in determining the constitutionality of retrial. It has long been clear, for example, that an acquittal on a defective indictment is nonetheless a bar to subsequent prosecution for the same offense.[23] Furthermore, if the state could stultify its own trial process by claiming that a prosecution on a defective information however concluded did not constitute former jeopardy, the Fifth Amendment's protection against persecution by prosecution would be undermined.
 
 
 36
 The Count II mistrial does not conveniently appear under the rubrics of the classic mistrial cases hung jury, juror disqualification, tactical exigencies of a wartime court-martial, or prolonged illness or incapacity of judge, counsel or witnesses.[24] We are aware, of course, that the Supreme Court has protested the development of per se rules to govern mistrials, see, e. g., Wade v. Hunter, 336 U.S. 684, 691, 69 S.Ct. 834, 93 L.Ed. 974 (1949) (criticizing Ninth Circuit rule that unavailability of healthy witness can never justify mistrial), as inconsistent with Perez' emphasis on flexibility, see Illinois v. Somerville, 410 U.S. 458, 467, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973). On the other hand, an inevitably ad hoc balancing test would threaten to transform Perez from an exception into an analytical formulation "whose escape hatch is larger than the compartment from which it offers egress."[25] A more promising approach, we think, is to compare the instant case with the Supreme Court's decisions in Downum, Jorn, and Somerville.
 
 
 37
 As the first Supreme Court case to hold that the double jeopardy clause prevented reprosecution after a mistrial Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), looms rather large on the constitutional landscape. When the government's key witness on two of six counts of passing checks stolen from the mail failed to appear, the United States asked that the jury be discharged. The defendant countered by requesting that the two counts be dismissed for want of prosecution and that trial continue on the other four. There was no suggestion that the witness' nonappearance was caused by anything other than the marshal's inability to serve him with a subpoena. The prosecution knew of this difficulty, but answered ready, apparently assuming that service had been made. The trial court granted the government's motion. In holding that retrial on any of the six counts violated the double jeopardy clause, the Downum Court established two propositions. First, Downum's disposition of the two affected counts means that the fact that the government's unpreparedness is due to "excusable oversight," 372 U.S. at 742, 83 S.Ct. 1033 (Clark, J., dissenting), rather than a plan to capture unfair tactical advantage, is not by itself sufficient to support a mistrial declaration. Second, Downum's disposition of the four other counts shows that the government may not frustrate a defendant's right to take the case to the jury by claiming possible adverse collateral estoppel effects if a multiple-count indictment is separated for trial. Downum is thus fully congruent with our own holding on Count I (grand larceny). Downum also tells us that Montana may not justify retrial in Count II (obtaining money and property by false pretenses) by claiming that the prosecutorial error was inadvertent or by asking for unitary adjudication of both counts.
 
 
 38
 United States v. Jorn, 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971), teaches an equally significant lesson. In Jorn, the trial court in a tax fraud case declared a mistrial to safeguard prosecution witnesses' privilege against self-incrimination. The Supreme Court concluded that the trial judge had been overassiduous in his attempt to protect witnesses who fully understood their rights, and held that retrial on all counts was prohibited. Jorn shows that a defendant's trial position need not be impaired in order for retrial to be prohibited: the government was the only party whose proof might have been weakened by the trial court's action. In the present case, Jorn means that deprivation of the "valued right" to take the case to the jury is enough in itself to bar retrial unless the mistrial declaration was actually necessary to protect other important interests.
 
 
 39
 In Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), the trial court granted the state's motion for a mistrial after it was discovered that the indictment failed to allege a necessary element of the offense charged. Illinois law prevented amendment of the information. The Supreme Court held that where a state law "procedural defect might or would preclude the public from either obtaining an impartial verdict or keeping a verdict of conviction if its evidence persuaded the jury," a mistrial is constitutionally available when "the mistrial (is), under (state) law, the only way in which a defect in the indictment could be corrected." 410 U.S. at 468-69, 93 S.Ct. at 1072.
 
 
 40
 Somerville's explanation of its holding is not entirely satisfactory. The state rule was designed to "implement the State's policy of preserving the (state-created) right of each defendant to insist that a criminal prosecution against him be commenced by the action of a grand jury," 410 U.S. at 468, 93 S.Ct. at 1072, and it was that policy which Somerville respected. It is hard to see, however, how a state's interest in protecting its citizens' state procedural rights should be sufficient to deprive those same citizens of what otherwise would be a federal constitutional right not to be placed twice in jeopardy. Indeed, it would seem that the more Procrustean a state rule is, the more likely it will be under Somerville sufficient cause for subjecting defendants to two trials and two juries.
 
 
 41
 Somerville's anomalies need not detain us, however, for the facts of this case point to a result that is fully consistent with Downum, Jorn, and Somerville. The applicable Montana statute, § 95-1505, Rev.Code of Mont.1947 (Smith ed. 1969), provides:
 
 
 42
 "(a) A charge may be amended in matters of substance at any time before the defendant pleads, without leave of court.
 
 
 43
 (b) The court may permit any charge to be amended as to form at any time before verdict or finding if no additional or different offense is charged and if the substantial rights of the defendant are not prejudiced.
 
 
 44
 (c) No charge shall be dismissed because of a formal defect which does not tend to prejudice a substantial right of the defendant."
 
 
 45
 One can hardly imagine a more "formal" matter than the correction of a glaring typographical error, and surely no "rights of the defendant" would have been undercut by the requested alteration. No state policy of ensuring that all criminal charges are initiated by indictment by the grand jury is involved here, for an information can be filed at the discretion of the prosecutor. Finally, although the standard by which a trial judge's action must be measured is ultimately federal, our researches indicate that Montana case law fully comports with our conclusion that the trial court's failure to grant the motion to amend was an abuse of discretion,[26] and that the sua sponte declaration of mistrial on Count II was made in circumstances that, under the Perez doctrine, do not permit retrial.
 
 
 46
 REVERSED and REMANDED.
 
 
 
 *
 Honorable Elbert P. Tuttle, Senior Judge, U.S. Court of Appeals, Fifth Circuit, sitting by designation
 
 
 [1]
 "There is probably some correlation between the slighting of (the interest of society in preventing the guilty from going unpunished) and the development of rules allowing a liberal splitting of offenses . . . when one slip may result in total immunity from prosecution . . . the temptation to multiply the number of bites at the apple may become irresistible." Note, Double Jeopardy: The Reprosecution Problem, 77 Harv.L.Rev. 1272, 1274 (1964); see Johnson v. Commonwealth, 201 Ky. 314, 256 S.W. 388 (1923) (each of 75 hands of poker a separate offense)
 
 
 [2]
 The district court's finding that Count II was dismissed at the defendant's request, 406 F.Supp. at 431, was clearly erroneous. The trial court acted sua sponte
 
 
 [3]
 Compare Brock v. North Carolina, 344 U.S. 424, 73 S.Ct. 349, 97 L.Ed. 456 (1953) (retrial after mistrial declared to allow state to secure testimony of witness claiming privilege against self incrimination did not violate Fourteenth Amendment), with Gori v. United States, 367 U.S. 364, 369, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961) (dictum) (declaration of mistrial to afford prosecution more favorable opportunity to convict violates Fifth Amendment); and compare Hoag v. New Jersey, 356 U.S. 464, 471, 78 S.Ct. 829, 2 L.Ed.2d 913 (dictum) (criminal collateral estoppel not required by Fourteenth Amendment), with Ashe v. Swenson, 397 U.S. 436, 445, 90 S.Ct. 1189, 1195, 25 L.Ed.2d 469 (1970) (collateral estoppel "is embodied in the Fifth Amendment guarantee against double jeopardy)."
 
 
 [4]
 See, e.g., Ludwig v. Massachusetts, 427 U.S. 618, 628-632, 96 S.Ct. 2781, 2787-2788, 49 L.Ed.2d 732 (1976) (Powell, J., concurring) (jury trial); Baldwin v. New York, 399 U.S. 66, 76-77, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1976) (Burger, C. J., dissenting) (same); Duncan v. Louisiana, 391 U.S. 145, 213, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (Fortas, J., concurring) (same)
 
 
 [5]
 Monaghan, The Supreme Court, 1974 Term Foreword: Constitutional Common Law, 89 Harv.L.Rev. 1, 2-3 (1975)
 
 
 [6]
 Williams v. Florida, 399 U.S. 78, 79, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970) ("the 12-man requirement cannot be regarded as an indispensable component of the Sixth Amendment"); Apodaca v. Oregon, 406 U.S. 404, 406, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (unanimity requirement is "not of constitutional stature")
 
 
 [7]
 See, e. g., Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1874)
 
 
 [8]
 See, e. g., Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959) (federal government may prosecute after state has convicted defendant); Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (state may prosecute after acquittal in federal trial); Waller v. Florida, 397 U.S. 387, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970) (state may not prosecute individual for same offense for which he has been prosecuted in municipal court); Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (collateral estoppel is requirement of Fifth Amendment double jeopardy clause)
 
 
 [9]
 See, e. g., Kepner v. United States, 195 U.S. 100, 129-30, 24 S.Ct. 797, 49 L.Ed. 114 (1904) (no government appeal from verdicts or judgments of acquittal, no matter how erroneous their foundation in law or fact)
 
 
 [10]
 See, e. g., United States v. Sisson, 399 U.S. 267, 288-90, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970)
 
 
 [11]
 See, e. g., United States v. Ball, 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300 (1896)
 
 
 [12]
 Mr. Justice Holmes first advanced the continuing jeopardy theory, see Kepner v. United States, 195 U.S. 100, 134-35, 24 S.Ct. 797, 49 L.Ed. 114 (Holmes, J., dissenting), to justify government appeal after acquittal, but neither appeal after acquittal, nor the theory has been accepted by the Court, see, e. g., Green v. United States, 355 U.S. 184, 192-94, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); United States v. Wilson, 420 U.S. 332, 351-52, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). As an alternative to the untidy "waiver" theory, continuing jeopardy has served as a metaphor to explain why a defendant who appeals his conviction may be retried, see, e. g., Price v. Georgia, 398 U.S. 323, 326, 90 S.Ct. 1757, 26 L.Ed.2d 300 (1970), but the Court currently deprecates both theories and finds retrial after defendant's appeal to be justified by analysis of the "respective interests involved," Breed v. Jones, 421 U.S. 519, 534, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975). For an attempt to structure a comprehensive set of double jeopardy rules around the continuing jeopardy concept, see Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1 (1960)
 
 
 [13]
 Compare Cornero v. United States, 48 F.2d 69 (9th Cir. 1931) (holding jeopardy attaches when jury is impaneled but finding "exceptions to this general rule as to what constitutes former jeopardy") and Himmelfarb v. United States, 175 F.2d 924, 932 & n. 2 (9th Cir. 1949), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L.Ed. 527 (1949) ("in numerous circumstances either the jeopardy attaching when the jury was sworn didn't count or didn't attach when the jury was sworn"), with Downum v. United States, 300 F.2d 137, 139-40 (5th Cir. 1962), rev'd, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) (suggesting jeopardy might not attach if no evidence introduced but nevertheless requiring a "sound reason" for termination of proceedings after jury has been impaneled)
 
 
 [14]
 Accord, United States v. Olsen, 504 F.2d 1222, 1224 (9th Cir. 1974) ("Since no jury had been empaneled and sworn, jeopardy has not attached.")
 
 
 [15]
 The Chief Justice joined Justice Harlan's plurality opinion. See 400 U.S. at 487, 91 S.Ct. 547
 
 
 [16]
 There is an indication in the Court of Appeals opinion that the state may have conceded that jeopardy attached during the juvenile proceedings, see Jones v. Breed, 497 F.2d 1160, 1166 (9th Cir. 1974), vacated and remanded, 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975), but it is clear that in the Supreme Court and in the federal district court, the state argued that jeopardy did not attach during the juvenile proceedings and, in the alternative, that the second trial did not constitute a second jeopardy but a continuation of the first proceedings, see Breed v. Jones, 421 U.S. 519, 532, 95 S.Ct. 1779, 44 L.Ed.2d 346 (1975); Jones v. Breed, 343 F.Supp. 690, 692 (D.C.1972)
 
 
 [17]
 Although Ex parte Lange, 85 U.S. (18 Wall.) 163, 172, 21 L.Ed. 872 (1873), indicated in dictum that "(i)t is the punishment that would legally follow the second conviction which is the real danger guarded against by the constitution," it has been firmly established ever since United States v. Ball, 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 300 (1896), that the "prohibition is not against being twice punished, but against being twice put in jeopardy; and the accused, whether convicted or acquitted, is equally put in jeopardy at the first trial."
 
 
 [18]
 State v. Padilla, 107 Ariz. 134, 483 P.2d 549, 553 (1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 718, 30 L.Ed.2d 740 (1972), did hold that Benton "did not define what constituted jeopardy and we believe the States are still allowed a certain degree of discretion," in adopting an attachment of jeopardy rule similar to Montana's. The reasoning in Padilla, however, is conclusory and the case itself was decided before United States v. Jorn, Illinois v. Somerville and Breed v. Jones. Moreover, because the Arizona Supreme Court in Padilla held that the mistrial had been justified because a juror was "irrevocably committed" to leave the jurisdiction, see 483 P.2d at 553-54, we doubt that the case's attachment of jeopardy rule can be considered as anything more than an alternative holding
 
 
 [19]
 The classic quotation is from Mr. Justice Black's opinion for the Court in Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957):
 "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."
 
 
 [20]
 United States v. Jorn, 400 U.S. 470, 484-85, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971); accord, United States v. See, 505 F.2d 845, 851 (9th Cir. 1974), cert. denied, 420 U.S. 992, 95 S.Ct. 1428, 43 L.Ed.2d 673 (1975)
 
 
 [21]
 E. g., Serfass v. United States, 420 U.S. 377, 390-91, 95 S.Ct. 1055, 1064, 43 L.Ed.2d 265 ("the 'constitutional policies underpinning the Fifth Amendment's guarantee' are not implicated before that point in the proceedings at which 'jeopardy attaches' . . . . This is by no means a mere technicality, nor is it a 'rigid, mechanical' rule. It is, of course, like most legal rules, an attempt to impart content to an abstraction.")
 The Montana statute is nearly a verbatim adoption of the Model Penal Code provision governing improper termination of trial. See Model Penal Code § 1.08 (P.O.D. 1962). In the only ALI commentary on § 1.08, an earlier tentative draft noted the difference between the rule that jeopardy attaches in a jury trial when the jury is sworn, and the rule that jeopardy attaches in a bench trial when the first witness is sworn, but the reporter could find "no reason" for the difference. Model Penal Code, Comment to § 1.09, at 53 (T.D. No. 5, 1956). The reporter, we believe, failed to recall that the Supreme Court has consistently recognized a major purpose of the double jeopardy clause as the protection of a defendant's "valued right to have his trial completed by a particular tribunal," Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949); accord, United States v. Dinitz, 424 U.S. 600, 603-607, 96 S.Ct. 1075, 1078-1080, 47 L.Ed.2d 267 (1976); Illinois v. Somerville, 410 U.S. 458, 469-71, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973); United States v. Jorn, 400 U.S. 470, 484-85, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). When one sees that the two attachment of jeopardy rules are necessary if this "valued right" is to be protected, the reason for the distinction seems plain.
 
 
 [22]
 See United States v. Wilson, 420 U.S. 332, 342, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975); Note, Double Jeopardy: The Reprosecution Problem, 77 Harv.L.Rev. 1272, 1273 & nn. 11-16 (1964)
 
 
 [23]
 "But, although the indictment was fatally defective, yet, if the court had jurisdiction of the cause and of the party, its judgment is not void, but only voidable by writ of error . . . . If the judgment is upon an acquittal, the defendant, indeed, will not seek to have it reversed; and the government cannot." United States v. Ball, 163 U.S. 662, 669-70, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896). As the Court recognized in Illinois v. Somerville, 410 U.S. 458, 466-68, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), this does not mean that a mistrial can never be justified by a defective indictment because of the possibility of a jeopardy-ending acquittal. It does mean, however, that when a defective indictment can be cured by amendment without a mistrial declaration, the first jury should not be jettisoned merely to serve the state's convenience
 
 
 [24]
 See, e. g., Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892) (hung jury); Thompson v. United States, 155 U.S. 271, 15 S.Ct. 73, 39 L.Ed. 146 (1894) (juror disqualified because member of grand jury); Simmons v. United States, 142 U.S. 148, 12 S.Ct. 171, 35 L.Ed. 968 (1891) (outside influence brought to bear on jury); Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949) (court-martial); United States v. Moon, 491 F.2d 1047, 1048 (5th Cir. 1974) (illness of defense counsel); United States ex rel. Gibson v. Ziegele, 479 F.2d 773 (3d Cir.), cert. denied, 414 U.S. 1008, 94 S.Ct. 370, 38 L.Ed.2d 246 (1973) (illness of key witness occurring after trial had begun)
 
 
 [25]
 Cf. Bickel, The Supreme Court, 1960 Term Foreword: The Passive Virtues, 75 Harv.L.Rev. 40, 43 n. 17 (1961)
 
 
 [26]
 See, e. g., State v. Terry, 77 Mont. 297, 250 P. 612 (1926) (amendment at close of state's case to change date of unlawful liquor possession from April 10, 1925 to April 24, 1925 was proper); State v. Polich, 70 Mont. 523, 226 P. 519, 519-20 (1924) (clerical error in an information which made date read "19122" instead of "1922" was "matter of form" under statute governing sufficiency of charges); State v. Beesskove, 34 Mont. 41, 85 P. 376, 377 (1906) (while time and place must "be so alleged as to enable a person of common understanding to know what is intended by the charge," time need not be alleged precisely unless it is element of offense); State v. Oliver, 20 Mont. 318, 50 P. 1018 (1897) (amendment at close of state's evidence to change name of alleged victim of robbery is permitted.)
 The current statute that controls amendment of criminal charges, § 95-1505, was enacted in 1967, see ch. 196, § 1, Laws of Montana 1967, repealing § 94-6207, Rev.Code of Mont.1947. Former versions of the statute also made use of the distinction between form and substance, permitting amendments as to both at any time before plea, but restricting amendments after plea to "matters of form" only, in the discretion of the trial judge. See Gransberry v. State, 149 Mont. 158, 423 P.2d 853 (1967) (per curiam). The difference between form and substance has never been pellucid, but the cases indicate that in Montana a change of substance is one which elevates the charged offense from a misdemeanor to a felony, compare Gransberry v. State, 149 Mont. 158, 423 P.2d 853 (1967), and State v. Fisher, 79 Mont. 46, 254 P. 872 (1927), with State v. Tritz, 164 Mont. 344, 522 P.2d 603 (1974), and State v. Knight, 143 Mont. 27, 387 P.2d 22 (1963), or which alters the type of crime charged so that a different offense, within the contemplation of the "same evidence rule," is alleged, see State v. Tropf, 530 P.2d 1158 (Mont.1975) (trial court correctly refused to permit amendment changing offense from possession to sale of drugs). On the other hand, where the amendment changes the charge from "first degree burglary" (which requires the state to prove the burglary occurred at night) to "burglary" (leaving the question of degree to the jury), it is a change of form only. See State v. Stewart, 161 Mont. 501, 507 P.2d 1050, 1053 (1973) (construing present statute); State v. Lu Sing, 34 Mont. 31, 85 P. 521, 522-23 (1906) (correction of misspelling is "matter of form" that does not render indictment insufficient).