**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAVELL FRIERSON,
              *Petitioner-Appellant,*

v.

JEANNE S. WOODFORD, Warden, of
the California State Prison at San
Quentin,

              *Respondent-Appellee.*

No. 04-99002

D.C. No.
CV-92-06251-DDP

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
June 2, 2006—Pasadena, California

Filed September 14, 2006

Before: Betty B. Fletcher, Barry G. Silverman, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez;
Concurrence by Judge Silverman

**COUNSEL**

Gwen Freeman, Knapp, Petersen & Clarke, Glendale, California; Edward A. Rucker, Santa Monica, California, for the petitioner-appellant.

Steven D. Matthews, Supervising Deputy Attorney General, Sacramento, California, for the respondent-appellee.

**OPINION**

PAEZ, Circuit Judge:

Lavell Frierson appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition challenging a California jury's special circumstances findings and death penalty verdict for his convictions for assault with a deadly weapon, robbery, kidnaping for the purposes of robbery, and first degree felony murder. In this opinion, we conclude that trial counsel failed to investigate and present important mitigation evidence at the penalty phase of the third trial. Had counsel's investigation been adequate, the sentencing jury could have heard evidence that Frierson suffered from multiple childhood head trauma and possible organic brain dysfunction, borderline mental retardation and a learning disability, a history of

chronic substance abuse, and an emotional disorder. We also conclude that counsel's performance was deficient when he failed to review juvenile court records and to challenge a key mitigation witness's assertion of his privilege against self-incrimination at the penalty trial. There is a reasonable probability that, had the jury been able to consider this evidence, the outcome of the penalty proceedings would have been different. We therefore reverse the district court's judgment denying habeas relief with respect to the penalty phase of the trial.[1]

## I. Background

This case arises from Frierson's 1978 kidnaping and robbery of Edgardo Kramer and Guillermo Bulnes, and his execution-style murder of Kramer. The California Supreme Court described the events leading up to the shootings as follows:

> On January 3, 1978, Kramer and Bulnes, two Peruvian airline employees, drove to the Holly Aire Motel in Inglewood to visit a woman named Chris. Bulnes knocked on the door to room 18 and told the young woman who responded—later identified as Zondre Wooley—that he was looking for Chris. . . . Wooley later said that Chris would arrive shortly. Bulnes and Kramer then sat in Bulnes's car parked across the street from the motel.
>
> Soon thereafter, [Frierson] approached the car and asked if they were waiting for Chris. When Bulnes said that they were, [Frierson] drew a gun and pointed it at Bulnes. He entered the back seat behind

---

[1]Concurrent with the filing of this opinion, we filed a memorandum disposition affirming the denial of Frierson's claims of error on the special circumstances issues raised in his petition. *See Frierson v. Woodford*, No. 04-99002 (memorandum).

the two men, and ordered Bulnes to lock the door, close the windows, start the car and begin driving.

During the ride, [Frierson] demanded and obtained property from both victims. . . . After traveling a few blocks at [Frierson]'s direction, [Frierson] ordered Bulnes to park the car. He then shot both Bulnes and Kramer in the backs of their heads. Kramer was killed. The bullet directed at Bulnes hit him above the ear but did not penetrate his skull. He was able to grapple with [Frierson] and disarm him. Bulnes pointed the gun at [Frierson] and left the car.

After running a few steps, Bulnes fell to the ground. [Frierson] grabbed him around the neck and tried to retrieve the weapon. During the ensuing struggle, Bulnes emptied the gun's chamber by firing shots into the ground and threw the gun away. When [Frierson] released his grip, Bulnes ran to a nearby street, flagged down a passing motorist, and was driven to a hospital.

At the retrial, Bulnes . . . positively identified [Frierson] as the assailant. He had observed nothing suggesting [that Frierson] was intoxicated . . . . [Frierson] and Wooley were arrested a few hours after the crime in room 18 at Holly Aire Motel. Distinctive watches owned by the victims, [Frierson's] bloody clothing, and other incriminating evidence was found in the motel room. An inmate who had been at the county jail when [Frierson] was initially apprehended testified that [Frierson] had recounted the entire crime to him, admitting that he had robbed and shot the two victims.

*People v. Frierson*, 808 P.2d 1197, 1200 (Cal. 1991) (*Frierson III*).

*Frierson I*

In February 1978, Frierson was charged with murder, robbery, kidnaping for purposes of robbery, and assault with a deadly weapon. The amended information alleged two special circumstances under the 1977 California death penalty law: that the murder was wilful, deliberate and premeditated, and that the murder was physically committed by Frierson during the course of both a robbery and kidnaping.[2] The jury found Frierson guilty of the crimes charged and death-eligible after finding both special circumstances true beyond a reasonable doubt. Frierson was sentenced to death. *People v. Frierson*, 599 P.2d 587, 592 (Cal. 1979) (*Frierson I*).

On direct review, the California Supreme Court reversed the conviction, special circumstances findings, and death sentence. *Id.* at 591. The court held that Frierson's counsel was ineffective for failing to investigate, prepare, and present a diminished capacity defense. As the court explained, counsel failed to seek and retain an expert to evaluate the effects of Frierson's PCP drug use on his physical and mental condition and on his mental capacity. *Id.* at 598-99. The court emphasized that counsel's failure was critical because the defense of diminished capacity was the only one available to Frierson at the guilt phase of the trial. *Id.* at 599. The court also found counsel ineffective for failing to call any mitigating witnesses at the penalty phase. *Id.* at 600.

*Frierson II*

At the second trial in 1980, Frierson's court-appointed counsel refused Frierson's request to present evidence of diminished capacity at the guilt phase of the trial, and instead chose to present that evidence at the penalty phase. *People v.*

---

[2]Former Cal. Penal Code § 190.2, subds. (c)(3)(i), (c)(3)(ii) (1977) (amended 1978). *See also People v. Frierson*, 599 P.2d 587, 605-14 (Cal. 1979) for a discussion of the 1977 California death penalty law.

*Frierson*, 705 P.2d 396, 396-97 (Cal. 1985) (*Frierson II*). After the prosecution completed its case-in-chief, defense counsel rested without calling any witnesses or presenting any defense. *Id.* at 398. At the penalty phase, however, defense counsel called a number of witnesses whose testimony suggested that at the time Frierson committed the crime, his mental state had been affected by his use of PCP.

Dr. Ronald Siegel, a psychologist and psychopharmacologist, testified that he had examined Frierson on two separate occasions in 1980 and had compiled an extensive drug history report. Dr. Siegel initially concluded that Frierson "was severely intoxicated with PCP" during the crime because of an "acute ingestion" of PCP on that day "as well as chronic use over a long period of time." *Id.* at 398. After reading Bulnes's eyewitness testimony, Dr. Siegel altered his conclusion, testifying that Frierson did not appear to be "acutely" intoxicated at the time of the crime. Dr. Siegel maintained, nonetheless, his belief that as a chronic PCP user, Frierson was severely intoxicated at the time the crime took place even though he did not show outward physiological signs of intoxication. Dr. Siegel specifically declined to opine on Frierson's mental state at the time of the offense.

Dr. Marvin Gillick, a forensic psychiatrist, testified that PCP intoxication during the crime prevented Frierson from deliberating, premeditating, and meaningfully reflecting on his actions. Dr. Gillick concluded that although Frierson had the mental capacity to form the intent to rob and kidnap the victims, his PCP intoxication " '[s]ubstantially impaired [his] capacity to form and harbor the criminal intent necessary for first degree murder,' i.e., deliberation and premeditation." *Id.* at 398.

The jury found Frierson guilty of the charged offenses, found him death-eligible, and returned a verdict of death. *Id.* at 399. The California Supreme Court affirmed the conviction but reversed the special circumstances findings and penalty,

holding that the trial court erred when it concluded that counsel could properly refuse Frierson's clearly expressed desire to present a diminished capacity defense at the special circumstances phase of the trial, rather than at the penalty phase.[3] *Id.* at 403.

*Frierson III*

At the third trial in 1986, Frierson was represented by Arnold Lieman, who presented a diminished capacity defense at the special circumstances phase of the trial. *Frierson III*, 808 P.2d at 1200. Dr. Gillick again testified that, at the time of the crime, Frierson "was able to form the specific intent to commit robbery and to harbor malice but, due to mental impairment caused by the ingestion of PCP, was unable to 'form the specific intent to commit first degree murder,' " meaning, to " 'deliberate, premeditate, and maturely and meaningfully reflect.' " *Id.* Narcotics consultant Carl Trout testified that it is difficult to observe whether a person is under the influence of PCP. *Id.* Several of Frierson's friends and family members bolstered the expert testimony by testifying that, at the time of the crime, Frierson's mental state was affected by his use of drugs, including PCP and alcohol. *Id.*

The prosecution's case-in-chief consisted of the same facts as were presented in *Frierson I* and *II*. Bulnes, the surviving victim, positively identified Frierson as the assailant. Investigating police officers testified to the discovery of incriminating evidence at the hotel room where Frierson and Wooley were found. Jimmy Walker, an inmate who had been at the county jail when Frierson was initially apprehended, testified

---

[3]The California Supreme Court also concluded that the evidence at trial clearly established that Frierson was guilty of first-degree felony murder as well as robbery, kidnaping, and assault with a deadly weapon. *See Frierson II*, 705 P.2d at 399. Although Frierson's federal habeas petition included claims that challenged his conviction, these challenges are not before us on appeal. Frierson does not contest his conviction on any count or the 25 years-to-life sentence for first degree felony murder.

that Frierson recounted the entire crime to him and admitted that he had robbed and shot the two victims. After a three-hour deliberation, the jury found the special circumstances true beyond a reasonable doubt. *Id.* at 1199.

At the penalty phase, the prosecution presented evidence that in 1972, Frierson was convicted in juvenile court for the murder of Douglas Green and committed to the California Youth Authority ("CYA"). *Id.* at 1200-01. On May 20, 1972, Green was killed at a Los Angeles house party from a bullet wound to the chest. Frierson, Michael Conception, and Lewis White, all 15 or 16 years old at the time, were arrested for the homicide. The investigating officer, Detective Thomas Miller, testified at Frierson's penalty trial that he interviewed the juvenile suspects for eight hours and then placed them in an interview room in order to overhear and record their conversation.[4] Miller testified that he recognized Frierson's voice and heard Frierson confess to the Green homicide, laughing and imitating Green's attempt to breathe as he was dying. The prosecution also presented evidence showing that Frierson committed two robberies in 1977, one of which was an armed robbery. *Id.* at 1201.

Frierson sought to show that Green was killed by Louis White at the party and that Detective Miller misidentified the confessor's voice. Philip McCain testified that he was present at the shooting and that he witnessed White shoot Green. McCain also testified that after the party, White confessed to him that "he did it." Conception testified that Frierson was not at the party but that White was present and was carrying a gun. Conception did not see who shot Green.

Lieman called White to testify on Frierson's behalf. White was prepared to testify that Frierson did not kill Green but that neither did he. According to Lieman, however, White pri-

---

[4]The tape recording of the conversation was subsequently lost and never recovered.

vately confessed to Lieman and defense investigator Donald Ingwersen that he killed Green. Rather than elicit White's confession before the jury, or impeach White's testimony with that of Ingwersen, Lieman encouraged White to invoke his Fifth Amendment privilege against self-incrimination—a privilege that White could not assert.[5] Evidence of White's alleged confession of the killing was thus never presented to the jury.

Frierson testified at the penalty phase and admitted the two December 1977 robberies but denied shooting Green. He testified about his drug problems and his remorse over the murder of Kramer. A correctional officer at San Quentin testified that Frierson was a model prisoner. A neighbor testified that Frierson had been a "good boy." Frierson's parents and sister testified about his drug usage and violent tendencies while on drugs. His parents also testified that Frierson had a normal childhood and that he had not been abused. Lieman did not present any evidence of Frierson's documented drug history. Nor did he present evidence of potential brain damage and child abuse that belied the parents' testimony that his childhood had been "normal." The jury returned a death verdict which the trial court later imposed. *Frierson III*, 808 P.2d at 1199. On direct appeal, the California Supreme Court affirmed the judgment in its entirety. *Id.*

*Federal Habeas Proceedings*

After exhausting his state court remedies, Frierson filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 in the Central District of California. Over the course of several separate rulings, and after two evidentiary hearings, the dis-

---

[5]There was no basis for White to invoke the Fifth Amendment. Jeopardy already had attached in White's juvenile adjudication and acquittal for Green's murder. Also, the statute of limitations for any charges other than for capital murder had lapsed by the time that White invoked his Fifth Amendment privilege.

trict court denied all 22 claims, issuing its final disposition and judgment on February 9, 2004. The district court also granted a certificate of appealability ("COA") as to three of Frierson's claims, two of which are now before us on appeal.[6]

In addition to the certified claims, Frierson moved to expand the COA to include thirteen additional claims. On November 21, 2005, we granted Frierson's motion to expand the COA with respect to four of the thirteen claims. We therefore have six claims before us on appeal, three from the special circumstances phase of *Frierson III*[7] and three from the penalty phase of *Frierson III*.

## II.   Jurisdiction & Standard of Review

The district court had jurisdiction pursuant to 28 U.S.C. § 2254. We have jurisdiction pursuant to 28 U.S.C. § 2253(a). Because Frierson filed his habeas petition in 1994, the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (AEDPA) does not apply. *Woodford v. Garceau,* 538 U.S. 202, 207 (2003). We review de novo the district court's decision to deny habeas relief. *Silva v. Woodford,* 279 F.3d 825, 835 (9th Cir. 2002) (as amended). A federal court may grant habeas relief only if the alleged non-structural errors "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted).

We review de novo legal questions and mixed questions of

___

[6]One of these claims involved a challenge to Frierson's conviction based upon trial counsel's ineffective assistance during the guilt phase of *Frierson II*. Because Frierson no longer appeals his conviction on any count, but instead focuses on the special circumstances and penalty phases of *Frierson III*, this claim has been abandoned.

[7]As noted above, we address the claims relating to the jury's special circumstances findings in a separate memorandum.

law and fact, including ineffective assistance of counsel claims. *Williams v. Stewart*, 441 F.3d 1030, 1037 n.2 (2006) (as amended); *Silva,* 279 F.3d at 835. We review for clear error, however, the district court's findings of fact. *Alcala v. Woodford*, 334 F.3d 862, 868 (2003). Similarly, state court factual findings are "entitled to a presumption of correctness unless they are not fairly supported by the record." *Silva,* 279 F.3d at 835 (internal quotation marks omitted); 28 U.S.C. § 2254(d) (1996).

## III.   Penalty Phase Claims

Frierson raises three claims of error in the penalty phase of *Frierson III*, including two IAC claims. First, he alleges that Lieman was ineffective for failing to investigate and present mitigation evidence of chronic drug abuse, organic brain damage, and child abuse. Second, Frierson contends that Lieman was ineffective when he induced, and failed to challenge, White's invocation of his Fifth Amendment privilege against self-incrimination, and in doing so prevented White from either confessing to the Green murder or being impeached with testimony of his earlier confession. Third, Frierson claims cumulative error.[8]

To prevail on his IAC claims, Frierson must show that (i) Lieman's performance was deficient, and (ii) this deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the performance prong, Frierson must show that Lieman's performance "fell below an objective standard of reasonableness." *Id.* at 688; *United States v. Fry*, 322 F.3d 1198, 1200 (9th Cir. 2003). To satisfy the prejudice prong, Frierson must show that "there is a reasonable probability that, but for [Lieman's] unprofessional errors, the result of the proceeding would have been

---

[8]Because we conclude that Frierson is entitled to relief on the basis of his ineffective assistance of counsel claims, we need not address this claim.

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Summerlin v. Schriro*, 427 F.3d 623, 629 (9th Cir. 2005).

A. IAC Claim F(2): Failure to present mitigation evidence

Frierson alleges that Lieman rendered constitutionally defective assistance by failing to investigate and present mitigating evidence at the penalty phase that included Frierson's extensive drug history; early childhood head trauma, mental impairments and organic brain damage; and child abuse. We agree.

*Deficient Performance*

[1] Counsel has a duty to conduct a reasonable investigation so that he can make an informed decision about how best to represent his client. *Strickland*, 466 U.S. at 691. Thus, counsel may render ineffective assistance "where he neither conducted a reasonable investigation nor made a showing of strategic reasons for failing to do so." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994). We have held that a failure to investigate and present, at the penalty phase of a capital trial, evidence of organic brain damage or other mental impairments, drug abuse, and a dysfunctional family or social environment may constitute ineffective assistance of counsel. *See, e.g.*, *Caro v. Calderon*, 165 F.3d 1223, 1226 (9th Cir. 1999) (holding that counsel was ineffective for failing to investigate defendant's mental impairments caused by childhood exposure to toxic chemicals); *Wallace v. Stewart*, 184 F.3d 1112, 1115 (9th Cir. 1999) (concluding that counsel was ineffective where counsel failed to investigate dysfunctional family background, drug history, and evidence of organic brain damage); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (holding that counsel's performance was deficient for failing to investigate readily available evidence of mental impairment).

**[2]** The imperative to cast a wide net for all relevant miti-
gating evidence is heightened at a capital sentencing hearing
because "[t]he Constitution prohibits imposition of the death
penalty without adequate consideration of factors which
might evoke mercy." *Caro*, 165 F.3d at 1227 (internal quota-
tion marks and citation omitted). Although counsel's duty to
seek out evidence of mitigation is not limitless, the Supreme
Court has recognized that the failure to pursue avenues of
readily available information—such as school records, juve-
nile court and probation reports, and hospital records—may
constitute deficient performance. *Rompilla v. Beard*, 545 U.S.
374, ___, 125 S.Ct. 2456, 2463 (2005); *see also Williams v.
Taylor*, 529 U.S. 362, 396 (2000) (holding that counsel failed
to "fulfill their obligation to conduct a thorough investigation
of the defendant's background" for purposes of sentencing
and thus failed to uncover voluminous evidence of a "night-
marish childhood" in juvenile court records). The Supreme
Court has also made clear that when counsel is on notice that
important mitigation evidence exists, a failure to uncover and
present such evidence at the penalty phase represents ineffec-
tive assistance of counsel. *Wiggins v. Smith*, 539 U.S. 510,
525 (2003) (holding counsel's failure to prepare a social his-
tory report fell below professional standards where counsel
was on notice of severe family dysfunction).

Lieman's deficient performance is readily apparent from a
comparison of the facts in the record to the facts in *Rompilla*.
In *Rompilla*, defense counsel knew that the prosecution was
seeking the death penalty by presenting aggravating evidence
of the defendant's history of violent felony convictions. *See*
125 S.Ct. at 2464. Nonetheless, counsel did not review any
part of the defendant's publicly available criminal history
record, including the trial transcript from which the prosecu-
tion read evidence into the record. *Id.* As the Court empha-
sized, "it flouts prudence to deny that a defense lawyer should
try to look at a file he knows the prosecution will cull for
aggravating evidence, let alone when the file is sitting in the
trial courthouse." *Id.* at 2467.

Here, the record indicates that Lieman never reviewed the trial transcripts of *Frierson II*. Lieman was unaware of the 1980 drug history report that Dr. Siegel prepared after he first evaluated Frierson. Dr. Siegel, however, referred to his report six times during his testimony in *Frierson II*. Lieman was also unaware that Dr. Gillick prepared a report in 1980, portions of which Dr. Gillick read into the record on five different occasions during his testimony in *Frierson II*.[9]

Lieman had only to review the trial transcripts of *Frierson II* to discover the existence of a prior investigative report prepared by Robert Turner (the "Turner Report") that indicated that a series of psychiatric evaluations had been conducted from 1971-74 while Frierson was committed to the custody of the CYA.[10] One evaluation dated September 1971 explained that Frierson exhibited "minor symptoms of organic brain dysfunction." Although Lieman later admitted that "organic brain dysfunction" could have "great legal significance," Lieman failed to pursue any avenues of investigation provided by the Turner Report—he did not consult with any CYA staff psychiatrists, he did not track down the psychiatric evaluation in question, and he did not seek the services of a neurologist even when alerted to evidence of possible organic brain damage. This is likely due to his failure to review the transcripts of the prior proceedings.

Also like *Rompilla*, Lieman failed to adequately investigate readily available school, hospital, prison, and juvenile court records and reports. In June 1964, Frierson suffered a head injury at the age of seven. In 1969, Frierson suffered a second

[9]As discussed *infra* III B, it does not appear that Lieman reviewed Frierson's juvenile court record either because had he done so, he would have been aware that White had been acquitted of the charge of murder and was thus not permitted to exercise his Fifth Amendment privilege against self-incrimination when testifying about the Green homicide.

[10]Lieman testified at the evidentiary hearing that he was unaware of the existence of the Turner Report.

head injury, a closed scull concussion, that required four days of hospitalization and resulted in two years of impaired eyesight. Lieman testified that he obtained Frierson's hospital records and was aware of Frierson's brain injuries, but chose not to consult a neurologist about the possible effects of multiple head trauma. At the evidentiary hearing, Lieman admitted that he had considered consulting a neurologist but decided against it after speaking with Frierson's parents because they did not believe that Frierson had suffered any lasting effects from the head injury. Lieman did not present evidence of the brain injuries at the penalty hearing.

Frierson's school records revealed an IQ score of 71, placing him in the mentally retarded range. School records also indicated that Frierson's head injury may have greatly affected his behavior and performance at school. The Turner Report described another IQ test in which Frierson scored a 90. Lieman, however, was unaware of either IQ score, and thus he never presented evidence at the penalty phase of possible mental retardation or low intelligence, or of a documented learning disability.

Although defense investigator Ingwersen located a prison staff psychiatrist at San Quentin willing to testify on Frierson's behalf, Dr. L.G. Nuernber, Lieman did not recall speaking with him. Dr. Nuernber diagnosed Frierson in 1981 with an "antisocial personality disorder" and "substance abuse, mixed, by history." Although Dr. Nuernber did not find evidence of organic brain damage, he recommended that psychological testing be undertaken for a more in-depth assessment. Lieman did not review or present any of the psychiatric reports and psychological evaluations that had been prepared at the CYA and San Quentin prison.[11]

---

[11]Lieman initially stated that he did not speak with any psychiatrist who may have examined Frierson at the CYA or San Quentin prison. He later recalled speaking briefly to Dr. Gary Bodner, who said he did not think he could help.

The most evident lapse in professional competence was Lieman's failure to prepare and present evidence of Frierson's chronic substance abuse for purposes of mitigation. At the evidentiary hearing, Lieman testified that he was aware that Frierson had used illegal drugs in the past and that Frierson began using PCP for "a year, year-and-a-half before" the murder. Despite Dr. Siegel's report that Frierson admitted using PCP on a daily basis, Lieman did not know the frequency of Frierson's drug use because he did not read the report. Lieman was also aware, from Frierson's parents, that Frierson began using drugs in junior high school.

Lieman testified that the compilation of a drug history was important for the defense in order to establish that Frierson was a chronic drug user and to support the contention that Frierson was under the influence at the time of the murder. Yet Lieman failed to compile a drug history. As the district court found, "[a]n attorney providing reasonable professional assistance would have been aware that a drug history had already been prepared by Dr. Siegel in 1980. . . . Lieman's lack of knowledge that a drug history had already been prepared for the previous trial constitutes deficient performance."

**[3]** Lieman's failure to review the transcripts of *Frierson II* for evidence of mitigation—resulting in his ignorance of Dr. Siegel's drug history report and the Turner Report's reference to organic brain dysfunction and a low IQ—was "below the range expected of reasonable, professional competent assistance of counsel." *Williams*, 529 U.S. at 370. Lieman also missed an opportunity to present evidence of borderline mental retardation and a learning disability by failing to investigate school records. Lieman ignored the red flag of possible brain damage caused by multiple childhood head injuries by failing to consult a neurologist, and instead relied on the lay opinion of Frierson's parents. Lieman also failed to obtain a single psychiatric evaluation from the CYA or San Quentin prison, or to speak with a staff psychiatrist, such as Dr. Nuernber, who was willing to help.

Lieman claims that he did not consult a neurologist to explore the consequences of Frierson's head injuries because he relied on Frierson's parents and on the opinion of Dr. Gillick, who testified during *Frierson II* that when he examined Frierson in April 1980, there was "no evidence of overt diagnosable disorder." However, Lieman did not read the transcripts of *Frierson II* and therefore could not have relied on Dr. Gillick's testimony. Moreover, the district court's conclusion that Lieman reasonably relied on Dr. Gillick's testimony in *Frierson II* is inconsistent with its own finding that Lieman's conduct was deficient for failing to recognize that Dr. Gillick had written a report, referenced numerous times during his testimony at trial.

"Counsel . . . [has] an obligation to conduct an investigation which will allow a determination of what sort of experts to consult." *Caro*, 165 F.3d at 1226. Although the defendant in *Caro* was examined by four experts prior to trial, including a medical doctor, a psychologist, and a psychiatrist, none of whom indicated that the defendant suffered from a mental impairment severe enough to constitute diminished capacity, we concluded that defense counsel was ineffective for failing to consult an appropriate expert with expertise in neurology or toxicology. Caro had been exposed to high levels of toxic chemicals and pesticides as a child, and because "none of the experts were neurologists or toxicologists," none was able to "conduct[ ] the neurological testing needed to evaluate the effects that the pesticides and chemicals had on Caro's brain." *Id.*

As in *Caro*, Lieman's failure to consult with a neurologist —the only expert qualified to evaluate organic brain dysfunction caused by multiple childhood head trauma—is not ameliorated by his alleged reliance upon the testimony of Dr. Gillick, a forensic psychiatrist. Further, Lieman admitted that he never spoke with Dr. Gillick about the advisability of a neurological examination "because Dr. Gillick never advised me that a neurological examination of Mr. Frierson was nec-

essary." But because Lieman never informed Dr. Gillick of the brain injuries or the Turner Report's reference to organic brain damage, Lieman "failed to provide [his expert] with the information necessary to make an accurate evaluation of [Frierson's] neurological system." *Id.* at 1227.

Lieman also claims that his failure to present evidence from prior psychiatric evaluations was a tactical decision to present Frierson in the best possible light at the penalty hearing, and thus to avoid evidence of an antisocial personality disorder. Lieman declared that he:

> did not want to put before the jury evidence of what is referred to as antisocial personality disorder, as I believed then and I continue to believe now, that such evidence would have harmed, rather than helped Mr. Frierson's defense. . . . [S]uch evidence would only have helped the prosecution's case by showing Mr. Frierson to be unredeemable and without remorse, and would thus have undermined my efforts to humanize and show Mr. Frierson to be a decent person, capable of rehabilitation and not a likely recidivist.

Thus Lieman, according to his own assertions, did not present the Turner Report, which describes Frierson as possibly having "psychopathic traits," or the testimony of Dr. Nuernber, because he felt that doing so would undercut his strategy of portraying Frierson as being worthy of remorse. In the same vein, he did not present evidence of Frierson's long history of voluntary drug use.

**[4]** It is clear from the record, however, that Lieman's failure to present evidence of Frierson's past psychiatric evaluations and chronic drug history was not compelled by his strategy, but rather by a failure to adequately investigate and prepare such information. His later-stated reasons appear to be post-hoc rationalizations rather than reasoned or strategic

choices. Lieman did not speak to Dr. Nuernber, nor did he read the reports prepared by Turner, Dr. Siegel, or Dr. Gillick. He was therefore unaware that a diagnosis of antisocial personality disorder even existed, and unaware of the extent of Frierson's chronic drug abuse. Because strategy presupposes investigation, Lieman's actions cannot be attributed to strategy. *See Sanders*, 21 F.3d at 1457 ("[C]ounsel can hardly be said to have made a strategic choice when . . . [he] has not yet obtained the facts on which such a decision could be made." (internal quotation marks and citation omitted)). Because the record "underscores the unreasonableness of counsel's conduct by suggesting that [Lieman's] failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment," *Wiggins*, 539 U.S. at 526, we hold that Lieman was deficient in his performance at the penalty phase.

*Prejudice*

We have recognized that in our analysis of IAC claims, particularly for those arising from a death sentence, the reasonableness of counsel's investigatory and preparatory work at the penalty phase should be examined in a different, more exacting, manner than other parts of the trial. Thus, in our concurrently filed memorandum, we held that Lieman did not prejudice his client by failing to develop and present evidence of chronic PCP use and organic brain dysfunction at the special circumstances phase. Here, however, we hold that but for Lieman's failure to develop and present such evidence at the penalty phase, for purposes of mitigation, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

**[5]** Whether counsel has adequately performed his duty to investigate in preparing for the sentencing phase of a capital trial is "measured against an 'objective standard of reasonableness.' " *Rompilla*, 125 S.Ct. 2462 (quoting *Strickland*, 466 U.S. at 688). Because the evidence presented at each phase of a trial serves a markedly different purpose, we ana-

lyze the reasonableness of counsel's efforts to prepare for trial and sentencing differently. As we explained in *Wallace v. Stewart*:

> *Hendricks* alludes to why the lawyer's burden might differ at the guilt phase from that at the penalty phase: Mental state is relevant at the guilt phase for issues such as competence to stand trial and legal insanity—technical questions where a defendant must show a specific and very substantial level of mental impairment. Most defendants don't have problems this severe, and counsel can't be expected to know that further investigation is necessary to develop these issues. By contrast, all potentially mitigating evidence is relevant at the sentencing phase of a death case, so a troubled childhood and mental problems may help even if they don't rise to a specific, technically-defined level.

184 F.3d at 1117 n.5. Thus in *Hendricks*, we held that it was reasonable for counsel to rely on his experts' findings that no diminished capacity defense was available at the guilt phase, and to terminate his perfunctory investigation of his client's known mental impairments. *See* 70 F.3d at 1038.

Our determination in *Hendricks* that counsel's investigatory work was reasonable, however, did not extend into the penalty phase. Because a sentencing jury is given "broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability," we have recognized that the presentation of relevant mitigation evidence is of vital importance to the jury's penalty determination. *Id.* at 1044. Accordingly, we concluded that "counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitute[d] deficient performance." *Id.* at 1043. We therefore held that because evidence of Hendrick's "nightmarish upbringing" and "mental problems" could have altered the

jury's decision to impose a death verdict, counsel was constitutionally ineffective. *Id.*

[6] Lieman's failure to develop and present important mitigation evidence undermines confidence in the fairness of the jury's death verdict. The jury was never presented with evidence that Frierson suffered multiple severe brain injuries as a child that may have resulted in organic brain dysfunction; that Frierson suffered from a learning disability, low intelligence, and may have been borderline mentally retarded; that Frierson suffered from an emotional disorder; and that Frierson was a chronic lifelong substance abuser.[12] We therefore conclude that the omitted evidence, taken as a whole, "might well have influenced the jury's appraisal of [Frierson's] moral culpability." *Wiggins*, 539 U.S. at 538 (internal quotation marks omitted).[13] We reverse the district court's denial of habeas relief as to Frierson's death penalty sentence on the basis of this IAC claim alone.

---

[12]Although the district court found Lieman deficient for failing to prepare a drug history report, it concluded that no prejudice resulted because "the jury had not been persuaded by the intoxication defense during the special circumstances phase [and thus] it does not appear unreasonable for trial counsel to forego further testimony on [Frierson's] abuse of controlled substances." The district court misapprehended the different purposes for the drug evidence at each phase of trial. Evidence of a history of chronic drug abuse may not have been sufficient to demonstrate that Frierson lacked the requisite mental state for the crime, but the extent of Frierson's drug use from an early age was an important mitigating factor that the jury did not have an opportunity to consider. The testimony by Frierson's parents did not begin to describe the magnitude of Frierson's problem with drugs.

[13]We also note that "overwhelming evidence of guilt does not ameliorate the failure to present mitigating evidence at the penalty phase." *Caro*, 165 F.3d at 1227.

### B.  IAC Claim F(3): White's Invocation of the Fifth Amendment

Frierson claims that Lieman was ineffective for inducing and failing to challenge Louis White's invocation of his Fifth Amendment right against self-incrimination when Lieman knew, or should have known, that in 1972 the juvenile court acquitted White of the charge of murder for the Green homicide.[14] We agree that Lieman's performance was deficient and that it was prejudicial.

*Deficient Performance*

[7] It is clear that Lieman's conduct as counsel "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Lieman had only to read the juvenile court records to discover that White had been acquitted of murder and could not therefore incriminate himself by testifying at the penalty trial about the Green homicide.[15] Nonetheless, before calling White to testify, Lieman advised the court: "Out of an abundance of caution I think the court should appoint counsel for Mr. White. I think he may make statements which may tend to incriminate him with regard to the 1972 shooting."

At the first evidentiary hearing, the district court found that "it is clear that trial counsel took affirmative steps to permit White to invoke his Fifth Amendment privilege." As the district court explained:

---

[14]In 1972, White and Frierson were both charged with first degree murder for the death of Douglas Green. The juvenile court sustained the petition against Frierson and acquitted White of that charge. Fourteen years later, in October 1986, White allegedly confessed to killing Green during an interview with Lieman and defense investigator Ingwersen.

[15]*See Breed v. Jones*, 421 U.S. 519, 529 (1975) (holding that jeopardy attaches in juvenile adjudication that determines whether juvenile violated criminal law); *Bretz v. Crist*, 546 F.2d 1336, 1343 (9th Cir. 1976).

> It was [Lieman] who originally raised the possibility
> that White might require separate representation
> because of his Fifth Amendment concerns. In a hear-
> ing held outside the presence of the jury, White
> admitted having a gun at the party but denied shoot-
> ing Green, or seeing who did shoot Green. . . . White
> then denied that he had previously told the defense
> investigator that he shot Green.

(internal citations omitted). After a recess, Lieman again
asked the trial court to appoint counsel for White. The trial
court did so, and then after ascertaining that White planned to
invoke the Fifth Amendment, the court ruled that White
would not be permitted to assert the privilege in front of the
jury. Lieman then sought, and was denied, a ruling from the
court declaring White unavailable as a witness. Only belat-
edly, Lieman recognized the untenable situation he had cre-
ated for his client. He stated:

> Of course, we are in a Pandora's Box. [White] won't
> testify because he wishes to assert the [Fifth Amend-
> ment] privilege. The court says because [White]
> asserts the privilege, [the court does not] know what
> his testimony would be; because [the court does not]
> know what his testimony would be, [the court] can't
> make a finding he is unavailable. . . . We are
> involved in a penalty phase of a potential death pen-
> alty case. The circumstances in aggravation are,
> among other things, that Mr. Frierson committed a
> 1972 homicide. That is one of the aggravating fac-
> tors. In fact, it's probably the key aggravating factor.
> . . . It behooves us to present testimony that perhaps
> he is not involved in the homicide.

Lieman thus foreclosed any possibility for the jury to hear that
White had confessed to the Green homicide, either through
White's own admission or through testimony by Ingwersen.
Lieman's "pandora's box" was of his own making.

The State argues that Lieman's conduct was not deficient because it was Lieman's strategy to have White assert the Fifth Amendment before the jury despite the court's ruling. Lieman asked White: "Way back in 1972 were you at a party where Mr. Green was shot and killed?" White answered: "I refuse to answer the question under the Fifth Amendment." The court cut short Lieman's direct examination of White shortly thereafter.

**[8]** In light of the record, it is not reasonable to infer that Lieman's strategy was to disregard the trial court's ruling with the expectation that White would assert the Fifth Amendment in front of the jury in response to his questions. The more reasonable explanation is that Lieman failed to review the juvenile court records just as he had failed to review transcripts of *Frierson II*, the Turner Report, Dr. Siegel's report, Dr. Gillick's report, and Frierson's school records. A reasonably competent lawyer would have understood that White was immune from prosecution for the Green homicide and therefore could not assert the Fifth Amendment privilege against self incrimination. Lieman's failure to recognize this constituted deficient performance.

*Prejudice*

The more difficult question is whether Lieman's failure to challenge White's invocation of the Fifth Amendment was prejudicial to Frierson. The district court concluded that Frierson suffered no prejudice because (1) Lieman achieved the same result of casting doubt on White's innocence; (2) the juvenile court adjudication itself was admitted into evidence; and (3) the jury would have viewed White's confession fourteen years after the fact with skepticism.

It is without question that the Green homicide was the central focus of the penalty hearing. The prosecution's closing argument emphasized this very point:

So what is in the nature of this man? In 1972 he had the taste for blood. The death of Douglas Brandon Green lying there on the floor with his blood gushing out of his mouth was merely an occasion for a poor joke — "I wonder if I can claim self defense for shooting him with his own gun." Douglas Brandon Green had 50 or 60 years of life left to him, but the defendant chose to take it.

Frierson's 1972 conviction rested upon Detective Miller's purported identification of Frierson's voice. The tape recording of the alleged confession was never produced in the juvenile court, nor at any other time. According to Frierson's amended habeas petition, four witnesses to the shooting testified for the prosecution at the 1972 juvenile court hearing, none of whom identified Frierson as the shooter. Neither Phillip McCain, who identified White as the killer, nor Earl Cobb, who saw Frierson somewhere other than where the shooting took place, testified at the juvenile hearing.

Phillip McCain testified at the penalty trial that he witnessed White commit the murder, but the prosecution's cross-examination of McCain effectively discredited his testimony. The following exchange occurred:

Q:   And you were inside the house when the shooting took place?

A:   Was I inside the house — yeah. It happened in the house.

Q:   Wasn't the shot fired out on the front porch?

A:   Yeah.

Q:   You were inside the house?

A:   I was outside.

Q: Didn't you tell the police you were inside the house when the shot was fired?

A: That is when he [Green] ran inside then.

Q: You were inside the house when he ran inside?

A: Yeah. I went in there too, yeah.

Q: You ran in after he was shot?

A: The shooting was going on, man.

Q: And you were inside the house?

A: No, I wasn't

Q: Where were you?

A: I told you I was outside.

Q: Where?

A: Outside on the front porch.

McCain also testified that on the same evening, White called him and confessed to the shooting.

Michael Conception was even less credible. According to Lieman, Conception arrived at court accompanied by two bodyguards dressed in such a manner "that he created the impression he was a 'drug dealer.' " Although Lieman "felt [Conception's] appearance would be a negative influence in the case," Lieman allowed Conception to testify because he did not think that Conception was "the type of individual I felt I could ask to change his appearance." Moreover, Conception's testimony that Frierson did not attend the party was contradicted not only by McCain but also by Frierson himself.

The prosecution suggested that Conception and McCain were former gang member friends willing to lie on Frierson's behalf.

[9] Therefore, the strongest evidence available that Frierson did not kill Green was White's confession to both McCain and Ingwersen. White's assertion of the Fifth Amendment before the jury did not achieve the same result because the jury had no reason to infer that White was referencing his role in the homicide. The question was not framed as "Did you kill Douglas Green" but rather, "Were you at that party?" Evidence that White confessed to the Green murder would have greatly strengthened Frierson's denial of guilt of this homicide, and when combined with McCain's testimony, and what appears to be a limited evidentiary basis upon which the juvenile petition was sustained, "there is a reasonable probability that at least one juror would have struck a different balance" in the outcome. *Wiggins*, 539 U.S. at 537.

Although this IAC claim is independent of the claim that Lieman was ineffective for failing to investigate and present important mitigation evidence at the penalty hearing, we are mindful that both claims arise from Lieman's lack of preparedness. In failing to prepare for the penalty phase, Lieman did not review transcripts of *Frierson II* for evidence of mitigation and thus was not aware of the Turner Report's reference to organic brain damage and low IQ. Lieman did not utilize the existing drug history report prepared by Dr. Siegel. Lieman did not review school records and present evidence of borderline mental retardation and a learning disability. Lieman did not consult and put on testimony by a neurologist explaining the consequences of multiple childhood brain injuries. Lieman did not review any psychiatric reports that existed at the CYA or San Quentin prison, and he did not present evidence of an emotional disorder. Finally, Lieman did not review juvenile court documents to confirm that White had been acquitted of murder and was thus available to testify about the Green homicide.

## IV.  Conclusion

**[10]** We reverse the district court's denial of habeas relief as to Frierson's death sentence. Because Frierson received ineffective assistance of counsel at the penalty phase, we conclude that the errors "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. We therefore remand to the district court with instructions to grant the petition for a writ of habeas corpus as to Frierson's death sentence unless the State grants Frierson a new penalty-phase trial within 120 days of the district court's order.

The judgment of the district court denying the petition as to Frierson's death sentence is **REVERSED**. The case is **REMANDED** to the district court for entry of an appropriate order for a penalty-phase retrial, if the State elects to seek such a retrial.

---

SILVERMAN, Circuit Judge, specially concurring:

At the penalty phase of this death penalty case, the most important issue was whether Frierson had ever killed before. To persuade the jury to impose a death sentence instead of life imprisonment, the prosecution presented evidence that fourteen years earlier, Frierson, as a juvenile, killed Douglas Green at a party and then laughed about it.

Frierson's lawyer hired an investigator, Donald Ingwersen, who located several of the individuals who were at the party when Green was killed. One of these individuals, Phillip McCain, testified that he saw Louis White shoot Green, and that White called McCain after the shooting and admitted that he (White) was the killer. He further testified that Frierson was not involved.

Another individual, Michael Conception, testified that he didn't see the shooting but was at the party and saw Louis White there with a gun.

Investigator Ingwersen contacted White himself prior to the penalty phase trial and was prepared to testify that White had confessed to him (Ingwersen) that he (White) had shot and killed Green. Defense counsel was unsuccessful in convincing the trial judge that White was "unavailable" and that White's statement to Ingwersen should have been received as a declaration against penal interest.

Defense counsel's next strategy was to call White as a witness in the hope that White would invoke the Fifth Amendment in front of the jury and thereby create an inference that he was the killer. Unfortunately, that strategy was based on a grievous misunderstanding of the law. In point of fact, White could *not* invoke the privilege against self-incrimination for one simple reason — he had been acquitted of the killing several years earlier. *See Ex Parte Critchlow*, 81 P.2d 966, 971 (Cal. 1938) (privilege against self-incrimination does not apply when prosecution is precluded by a prior acquittal). As a result, White *could* have been forced to testify and asked point-blank if he had killed Green. *People v. Seijas*, 114 P.3d 742, 751 (Cal. 2005). If White had said yes, his on-the-stand confession would have been heard by the jury deciding Frierson's fate. If he had said no, he could have been confronted with his confession to Ingwersen. If White denied confessing to Ingwersen, Ingwersen could have been called to testify about what White had told him — not as a declaration against penal interest but as a prior inconsistent statement. Cal. Evid. Code §§ 770 and 1235; *People v. Avila*, 133 P.3d 1076, 1137-38 (Cal. 2006).

Instead of a strategy that would have gotten White's confession before the jury, defense counsel, in direct contravention of the trial judge's instructions and in ignorance of what the law really allowed him to do, improperly elicited White's

invocation of the privilege in the presence of the jury. A side-bar conference was called immediately and counsel was admonished for having adduced White's claim of the privilege. After the side-bar, White was asked two more questions and then was quickly ushered off the stand. No further reference to White's taking the Fifth was or could be made. For example, counsel was prohibited from arguing to the jury that White's claim of the privilege gave rise to an inference that White had killed Green. White's claim of the privilege was not — and could not be — mentioned again. Cal. Evid. Code § 913; *People v. Frierson*, 808 P.2d 1197, 1203-04 (Cal. 1991); *People v. Johnson*, 39 Cal.App.3d 749, 759 (Ct. App. 1974).

Misunderstanding how the law would have allowed White to be questioned about Green's murder and impeached if necessary with his recent confession to the investigator, defense counsel pursued a strategy that yielded nothing more than White's improper invocation of the privilege that could not be considered by the jury. Counsel's undisputed misunderstanding of the law caused him to take this ill-considered course.

The subject of White's testimony was no trifling matter, either. The issue was whether Frierson had killed before. Counsel's error resulted in the loss of evidence that might have convinced a jury that White — not Frierson — had killed Green. What could have been more important than that to a jury weighing life or death for Frierson?

Because I am not able to find that counsel's error in this respect was not prejudicial, I join the majority in reversing the denial of the writ of habeas corpus, as to the penalty phase of the trial, on this basis only. Having come to this conclusion, I do not reach whether counsel also was ineffective in his presentation of mitigating evidence.